**UNITED STATES of America, Plaintiff,**

**v.**

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

No. 80 C 5124.

United States District Court, N.D. Illinois, E.D.

Dec. 9, 1985.

Neil H. Koslowe, Sp. Litigation Counsel, Dept. of Justice, Washington, D.C., for plaintiff.

Robert C. Howard, Robert M. Weissbourd, James Bradtke, Hartunian, Futterman & Howard (Chartered), Hugh R. McCombs, Jr., David Narefsky, Denise L. Jarrard, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

ASPEN, District Judge:

In this Memorandum Order we resolve the issues raised by the parties concerning the Remedial Order and the 1985 Bilingual Transition Funds. In compliance with the request in our October 15, 1985 opinion, the parties have worked out an agreement as to much of the structure of the Remedial Order. We discuss below primarily what was not agreed upon.

---

## A. *The Remedial Order*

After carefully reviewing the Board's proposed Remedial Order and the parties' comments, the Court endorses the general format of the proposed order. In addition, except for the amendments discussed below, the Court adopts the Board's proposed order as written. As described later, the Board shall prepare a revised Remedial Order for our signature.

### 1. *Paragraphs 1(i) and 1(j)*

The United States' objections to paragraphs 1(i) and 1(j) are overruled, with one minor qualification. The Board is correct that the United States failed to give appropriate priority consideration in FY 1983, and that the Yates Bill did not discharge the United States' duties for that year. At the same time, the United States is correct that the Yates appropriation counts for *something*, although it is somewhat disingenuous for the Executive Branch to rest on this laurel when it vigorously opposed the Yates Bill and acted in bad faith by doing so. Nevertheless, the Remedial Order's declarations should reflect that at least the Legislative Branch of the United States provided funds in 1983, and that the Executive Branch obeyed Congress' order to provide those funds directly to the Board. Accordingly, ¶ 1(i) should be amended by inserting in the last line, following "fiscal 1983," "except for the amount appropriated for and provided to the Board under the so-called 'Yates Bill.'"

As for ¶ 1(j), we disagree with the United States that the rhetoric is "excessive." The complete record of the case more than adequately supports that declaration.

### 2. *Title IV*

For reasons stated in the October 15 opinion, "equitable fair share" of FY 1984 funds to which the Board is entitled shall be $1.5 million, to be provided directly (the method the United States prefers) to the Board within 30 days, or as expeditiously as possible pursuant to applicable regulations, if any. This award is in addition to the FY 1984 amount granted to the DACs and SEA serving the Board, as well as the amount of FY 1983 excess Title IV funds. Because the United States has wisely opted to provide Title IV funds directly, and because it had already agreed to provide the excess 1983 Title IV funds to the Board, it shall provide those funds directly as well.

In reaching this share determination, we reject the Board's renewed arguments for a bigger piece of the Title IV pie. The amount ordered above is, we think, the "maximum" level of funding available without undue harm to other grantees. We also reject the United States' arguments that the Magnet Schools program caps the Board's share at $1.2 million.[1] There Congress determined by statute the "maximum level" available. Congress set no such ceiling in Title IV. However, the Magnet Schools program is not altogether irrelevant to Congress' general notion of an equitable maximum share a local school district deserves out of a nationwide pie. Our share determination is roughly within the parameters of this very fuzzy indication of Congressional intent and gives the Board a goodsized piece of the Title IV pie, while maintaining the national character of the program. It is not inconsistent with any indication of Congressional intent.

We do not think a reprogramming is necessary, as a matter of law or even as a matter of comity with Congress, in order for the Secretary to provide funds directly to the Board. As we held in the October 15 opinion, the Congressional history does not indicate that Congress mandated indirect funding; nor did it "direct" or "earmark" it by Committee Report. *See* Conclusion 6.10. Rather, it simply indicated without disapproval in committee reports how the Secretary had been spending the funds. This language is not the same as language in other reports where Congress "directed," "urged," or "recommended" that money be spent in a certain way. Only in the

---

1. We observe that the United States' proposal of a $1.2 million share was not unreasonable and was made in good faith. We applaud the government's cooperation in the aftermath of the October 15 opinion.

latter context has the Secretary historically reprogrammed as a matter of comity. Accordingly, we agree with the Board that the funds shall be provided within 30 days whether or not the Secretary decides to ask Congress for reprogramming.

In arguing that a reprogramming is necessary, the Secretary's reliance on our October 15 opinion at page 151 and on the Second Appeal is misplaced. In our opinion, we were discussing reprogramming of certain excess fund accounts, within a context where a reprogramming request had historically been made as a matter of comity, if not law. Here, the committee reports contain no "directions" to the Secretary, so that a reprogramming request is not necessary even as a matter of historical practice. As such, our order is also consistent with the Second Court of Appeals opinion. In full recognition of the Seventh Circuit's teachings about respect for our co-equal branch of government and deference to its general policy decisions, we gave the Secretary the option—which he accepted—to provide funds directly, a less intrusive course (and one that frees more funds for other grantees) which the Court of Appeals would endorse, assuming, of course, we are correct on the scope and pipeline issues. Nothing in the Second Opinion or in our October 15 opinion compels us to delay relief to the Board so that the Secretary can make a reprogramming request to Congress that is not even compelled by his past practices or by law.

In light of this order, sub-paragraphs (a)–(d) on pages 5–6 of the proposed Remedial Order are not relevant for fiscal year 1984 Title IV funds and should be deleted. As for future years, to the extent indirect funding is provided, we agree with the United States that those sub-paragraphs should not be etched in stone at this time. The parties should cooperate as to such administrative mechanics and try to reach a proper procedure by stipulation. We agree with the Board that it should have a large

say about where the money goes, but so should the United States. The Consent Decree envisioned the parties working together as partners, rather than as prepetual adversaries, and we should not be required to decide administrative mechanics where the parties are acting in good faith. We hope we will not be requested to resolve these mechanics for the parties in future years.

We strongly disagree with the United States' proposal that an administrative procedure should take place for the FY 1984 funds before they are provided in order to verify the eligibility and cost efficiency of the Board's projects. Both we and Judge Shadur have determined that the Board's Title IV projects are statutorily eligible, contain reasonable costs and materially aid the success of the desegregation plan. *See* October 15 opinion, "Chapter 2"; *also* Findings 676–84. The Secretary essentially proposes to reinvent the wheel, to do what we have already done. While the Secretary normally should make these determinations in the first instance, Judge Shadur and this Court did so because the Secretary steadfastly refused to do so for so long. The Secretary has had the relevant information since March 1984 and only now proposes to make this determination. We cannot countenance more delay in the provision of funding. Continued delay harms not only Chicago's children, but public school children in other cities, whose funding remains uncertain pending resolution of this case.[2] Resolution and certainty have a value, and our opinion as a court of equity is that this concern is now extremely urgent. Thus, we will write no formal administrative process—with its attendant delays—into the Remedial Order for the provision FY 1984 funds. As for future years, once the application and priority process gets on track in accordance with the October 15 opinion, a normal administrative process will be in place.

---

**2.** Indeed, the delay and uncertainty have gotten to the point where members of Congress outside of the Illinois delegation have written the Court

to urge a quick resolution. A copy of this correspondence and the Court's response has been furnished by the Court to the parties.

This is not to say we do not want the Secretary's input on how the Board will be spending the money. As the Board concedes, the Secretary- must play a role in monitoring the Board's expenditure of federal funds. Accordingly, the Proposed Remedial Order should be amended to reflect this policy: The Board and the Secretary shall informally work together in deciding which Title IV projects to fund. In any event, within thirty days the Board shall provide the Secretary and the Court with an outline as to how it plans to spend its Title IV funds. That is, the outline shall describe how much money will be spent on which of its projects. The Board shall also cooperate with the Secretary in completing relevant forms and providing information that the Secretary needs. If he chooses, the Secretary may within 20 days thereafter object or otherwise comment, and the Court may then order some changes in how the Board is spending the money.[3] If the parties can agree to an alternative monitoring process instead of the one just proposed, they may include it in the revised draft Remedial Order or substitute it later by amendment.

### 3. *The Discretionary Fund*

For the reasons stated in the October 15 opinion, the Board's equitable fair share of Discretionary Funds is $1.5 million, to be provided within 30 days or as expeditiously as possible pursuant to applicable regulations, if any. For reasons stated above, we reject the United States' proposal for a formal administrative process with respect to FY 1984 funds. The second paragraph of part 3 of the Board's proposed order (page 8) shall therefore remain intact, with the following addition: The Board and the Secretary shall make every good faith effort to agree to which "model" programs shall receive funding. The Board shall also cooperate with the Secretary in providing relevant information the Secretary requires. In any event, within thirty days the Board shall report to the Court which model programs it will fund, and how much money each will receive. The Secretary may file any objections within twenty days thereafter as to which programs the Board has chosen or the amount of funds devoted to each.

### 5. *Follow-Through*

The *total* Follow-Through share shall remain $1.0 million, of which $273,541 has already been provided, leaving a balance of $726,459. The remainder of the Board's proposed paragraph 4 (pages 8–9) shall remain intact, except that its second paragraph shall contain an addition of the type discussed above, which requires the Board to file a report within thirty days and to cooperate with the United States in completing forms and providing information; the United States may file relevant objections within twenty days thereafter.

### 6. *Excess Funds*

The proposed paragraphs concerning the Excess Funds shall remain as written. For reasons stated below we agree with the United States that the *lower* figure for funds in "Category 1a" shall be used.

We have carefully examined the parties' arguments concerning excess funds in the Office of Civil Rights ("OCR") and Departmental Management ("DM") accounts. We will consider each account in turn, but note at the outset that we will take a slightly different approach than that taken by the parties. We disagree with the Board that

---

**3.** If the Board is spending money on ineligible projects or in an inefficient manner, we could order it to modify its practices. However, since the Board's Title IV needs greatly exceed the funding it will receive, we think it highly unlikely that any of the United States' objections, if meritorious, would result in a reduction of the Board's total share. Rather, the most we foresee doing is telling the Board, for example, to spend money on one project over another or on a certain activity within a project.

All of this does not mean that we want or expect to see objections. As the order shall reflect, we expect the parties to work together to decide which projects to fund. Given the magnitude of the Board's needs, the parties should easily be able to agree on several eligible projects and should be able to decide how much funding to devote to these projects. As indicated above, the parties should work together so as not to require the Court to oversee each and every mechanic of implementing the Consent Decree.

the language of the two statutes unambiguously favors its claim of entitlement to these funds. So we must turn to the legislative history. But we disagree with both sides that the meager legislative history is at all helpful. Frankly, we think we are faced with no clear indication of Congressional intent as to the scope of these accounts. But a decision must be made, and for the following reasons we decide that the Board is not presently entitled to the funds restrained in these accounts. Accordingly, they are to be placed in "Category 3" as defined in the October 15 opinion, and dealt with as prescribed in that opinion.

### a. *Office of Civil Rights*

The relevant statutory provision says:

(c) Authority of Assistant Secretary

In addition to the authority otherwise provided under this section, the Assistant Secretary for Civil Rights, in carrying out the provisions of this section, is authorized—

   \*     \*     \*     \*     \*     \*

(3) to enter into contracts and other arrangements for audits, studies, analyses, and other services with public agencies and with private organizations and persons, *and to make such payments as may be necessary to carry out the compliance and enforcement functions of such Office.*

20 U.S.C. § 3413(c)(3) (emphasis added). The Board seizes upon the underlined phrase and relies upon the following syllogism in arguing that the statute authorizes the Secretary to pay the Board funds from this account:

(1) The Secretary may make "necessary" "payments" in order to "carry out compliance and enforcement *functions of*" the OCR;

(2) One of the "functions" of the OCR is to enforce the Nation's civil rights laws and, thus, consent decrees like the one in this case.

(3) The Secretary may therefore make "payments" to the Board which are "nec-

essary" to help it "comply" with the consent decree and the civil rights laws. While this reasoning is plausible and seductive, it is overly simplistic. Contrary to the Board's assertions, the language is not unambiguous. The statute authorizes payments for carrying out "compliance and enforcement functions *of the OCR.*" (Emphasis added.) This language can be construed in different ways. As the Board suggests, the OCR can in theory "enforce" or foster "compliance" with the civil rights laws simply by giving money to the Board. On the other hand, enforcement might mean something narrower: it might simply encompass tasks that the OCR *itself* must perform in order to help local agencies meet civil rights standards. That is, "enforcement" of laws, in this case, the civil rights laws, does not necessarily or usually mean the giving of money to the party subject to enforcement; rather, it might only mean, among other things, the giving of advice, help, admonishments or threats *by* the *OCR.* Under this conception of enforcement, the power to make any payments would mean that the OCR can spend money to carry out *these* functions, but not just hand money to the Board. Thus, the Board's syllogism begs the question. Even if one of the "functions" of the OCR is to "enforce" the civil rights laws, we still must ask whether giving the *Board,* a local agency, some of the OCR's money is a species of "enforcement" Congress contemplated.[4]

Similarly, the statutes' authorization to "make *necessary* payments" does not unambiguously imply an authority to give money directly to a local school board to pay for the operating costs of a desegregation plan. It could merely be a broad, catch-all provision for making any of a number of administrative payments that are "necessary" *to the office* as it performs *its* duties. The context of the statute illustrates this point. The rest of the section clearly focusses on costs of administering the OCR itself and the costs of paying for materials and services which would let the

---

**4.** The meaning of "compliance function" is sim- ilarly ambiguous.

*OCR itself* enforce the civil rights laws.[5] Nothing in the statute in clear terms authorizes the making of grants to local school boards. This omission is telling. The other statutes we have dealt with in this case which authorize grants to local school boards do so explicitly and clearly. *See, e.g.,* 20 U.S.C. § 1441 (handicapped research grants); 20 U.S.C. § 3221 *et seq.* (bilingual education grants).

It is clear then that in authorizing the Secretary to make "payments" to local agencies, Congress' usual practice is to say so in no uncertain terms. Given this track record, we think it unlikely that Congress would have intended that § 3413(c)(3) give the Secretary authority to make the type of broad grant the Board is seeking. The phrase the Board relies on is buried among other provisions which focus on the functioning of the OCR itself. We are skeptical that Congress would delegate such broad open-ended grant-making authority in this vague fashion when it did not do so in other related contexts.

Having determined that the statute's language is ambiguous, we would customarily look to the legislative history to divine Congress' intent. But the sparse legislative history cited by the parties provides few, if any, clues as to Congressional intent. Most of the cited reports merely track the statute's language, or have inconclusive variations. Both parties' arguments concerning this history are valiant but failed tries at infusing meaning where none exists. The shallow, murky history simply does not suggest that Congress considered or intended that this money be spent directly on local agencies. In all probability, Congress never even thought about it. If the history means anything, its meaning flows not from what Congress said, but from what it did not say. If Congress did in fact intend that the Secretary have an extremely broad, catch-all authority to make grants to local school boards, one might fairly expect that it would clearly say so—at least in the committee reports if not in the statute itself. But it did not say so, and this failure argues against a reading that delegates such a broad, open-ended authority to the Secretary.

In the final analysis, we think we must resolve these ambiguities against the Board[6] and hold that § 3413(c)(3) does not authorize the Secretary to grant the Board money directly to pay for its desegregation plan. If the Board were correct, § 3413(c)(3) gives the Secretary extraordinarily broad grant-making authority. Absent strong evidence of intent to the contrary, we do not believe that Congress would bury such an open-ended provision in a clause of a subsection of an act that is primarily administrative. When Congress gives the Secretary power to grant money to local school boards for certain projects or operating costs, it usually says so clear-

---

5. The other sub-sections state that the Assistant Secretary is authorized

    (1) to collect or coordinate the collection of data necessary to ensure compliance with civil rights laws within the jurisdiction of the Office for Civil Rights;

    (2) to select, appoint, and employ such officers and employees, including staff attorneys, as may be necessary to carry out the functions of such Office, subject to the provisions of Title 5 governing appointments in the competitive service and the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates;

    \*    \*    \*    \*    \*    \*

    (4) notwithstanding any other provision of this chapter, to obtain services as authorized by section 3109 of Title 5, at a rate not to exceed the equivalent daily rate payable for grade GS–18 of the General Schedule under section 5332 of such title.

20 U.S.C. § 3413(c)(1), (2), (4).

6. In its Reply Appendix at 43, the Board says that the "United States sets forth no persuasive authority to demonstrate that it cannot use these excess office funds for the purposes suggested by the Board." This misstates the burden. The *Board* must show by persuasive authority that it can use the excess funds for its purposes. As it concedes, the Second Court of Appeals Opinion was clear that ¶ 15.1 cannot by itself disturb statutory intent. While the Board's arguments about the OCR account are forceful, we think that the evidence supporting the Board's position is ambiguous and sparse. Since it carries the burden of persuasion, we must resolve our strong doubts against its position.

ly. It has not said so here either in the statute or its history, and, as such, we conclude that the Board has not met its burden of showing entitlement to the funds restrained in this account absent a reappropriation.

In so holding, we do not adopt the intimations of the United States that the OCR account is purely administrative in the sense that it authorizes *only* overhead expenses for such things as rent, salaries and travel. As the Board points out, Congress has approved of OCR's past practice of using its money to pay third parties to give technical aid to school boards implementing desegregation plans. *See* S.Rep. 98–247, 98th Cong. 1st Sess. 163 (Sept. 28, 1983); H.R.Rep. 98–357, 98th Cong. 1st Sess. 130 (Sept. 16, 1983). In fact, Congress has encouraged the Secretary to do more of this.[7] But we disagree with the Board that this practice of indirect assistance necessarily implies that a direct grant is proper under the statute as well. There is a significant difference between the contracts the Secretary has made and the direct grant the Board seeks: the first is a delegation of a duty the OCR would otherwise perform *itself* for one of *"its* compliance or enforcement functions"; the second is simply a grant of money. Only the first "payment" is consistent with the narrower definitions of "compliance and enforcement" and "necessary" we discussed and adopted earlier. The statute authorizes payments "to carry out ... functions *of [the OCR]."* The money spent on technical assistance is money spent to perform a function *of the office*, albeit one that was delegated to a third party by contract. But whether it gives technical assistance itself or contracts that task out, the OCR is spending the money to "carry out" a function *"of it,"* to do what *it* must do: enforce compliance with the civil rights laws. This is quite different from handing that same money over to a local school district to pay directly for the operating costs of desegregation. As we held above, we need a clearer signal from Congress that such a payment is authorized before reading such broad authorization into the statute's ambiguous language.[8]

### b. *Departmental Management*

■ The same analysis applies here as well. That statute in dispute, 20 U.S.C. § 3488, says:

Subject to any limitation on appropriations applicable with respect to any function or office transferred to the Secretary or the Department, there are authorized to be appropriated for fiscal year 1980 and each succeeding fiscal year such sums *as may be necessary to carry out the provisions of this chapter* and to enable the Secretary to administer and manage the Department. Funds appropriated in accordance with this section shall remain available until expended.

(Emphasis added). The "chapter" referred to is the Department of Education Reorganization Act. Pub.L. 96–88 (Oct. 17, 1979). One of "the provisions of this Chapter" is 20 U.S.C. § 3475(a), which says:

(a) Subject to the provisions of the Federal Property and Administrative Services Act of 1949 [40 U.S.C.A. 471 *et seq.*], the Secretary is authorized to make, enter into, and perform such contracts, grants, leases, cooperative agreements, or other similar transactions with Federal or other public agencies (including State and local governments) and private organizations and persons, and to make such payments, by way of advance or reimbursement, as the Secretary may determine necessary or appropriate to carry out functions of the Secretary or the Department.

---

7. *See* S.Rep. 98–247 at 164. That Report also notes that the OCR is moving from contract-based to in-house operation of its technical assistance activities.

8. Indeed, the fact that Congress endorsed the Secretary's giving of technical assistance cuts against the Board's position at least as much as it helps it. Arguably, if Congress intended that the funds also be given directly to local school boards, it would have said so. Its silence suggests that it did not intend—or at least did not consider—this use of the funds.

We have carefully examined the Board's arguments and the legislative history (which again is inconclusive) and conclude largely for the reasons stated above that these sections, like § 3413, do not give the Secretary *carte blanche* authority to make direct grants to local educational agencies of funds appropriated to the Departmental Management account. Section 3475 is, we think, merely a general overall delegation of power to the Secretary to, in effect, do business as the Secretary. Section 3488 too is primarily administrative in scope. We do not think the statute's language or the legislative history reveal Congressional intent to authorize a grant of the kind the Board seeks.

### c. *Appendix to Remedial Order*

In light of the foregoing, the Appendix to the Remedial Order should take the form of the alternative proposed by the United States. That is, the excess funds in the OCR and DM accounts should fall into Category 3, but continue under restraint.

### 7. *Other Paragraphs*

The remaining paragraphs of the Board's proposed order shall remain intact, except as follows. The second footnote on page 17 should be amended to reflect the apparently undisputed fact that the United States gave the Board priority with respect to FY 1985 Magnet School funds.[9]

### 8. *Conclusion*

Within three days the Board shall submit a revised draft Remedial Order consistent with the discussion above. Pursuant to the stipulation of the parties, the Order will be stayed seven days from the date of our signature so that the parties may attempt to resolve the issues concerning a stay and interim relief pending appeal. It is so ordered.

### B. *1985 Bilingual Transition Funds*

a. We reaffirm that in light of our holdings in our October 15, 1985 opinion concerning the scope and pipeline issues, the Board is virtually certain to succeed in showing that it is entitled to "priority treatment" concerning the Bilingual Transition Funds. As for the "fair share" of funds to which the Board is entitled, both parties make valid points in their Position Papers with respect to this program. On the one hand, the Board is correct that under our resolution of the pipeline issue "priority treatment" begins at the beginning of the administrative pipeline, and that the Secretary's discretionary decision to allocate $54 million of the $77 million in Transition Funds to "continuation grants" is not insulated from review. On the other hand, the United States is probably correct that this decision is proper under the Second Court of Appeals opinion and ¶ 15.1 of the Consent Decree. We emphasized several times in the October 15 opinion that ¶ 15.1 elevates the Board to but one priority among many, and that the Second Opinion affords the Secretary leeway to set other priorities which effectively diminish the pool of otherwise available funds. Accordingly, absent evidence of intent to hurt the Board, we are not likely to tamper with the Secretary's decision to devote $54 million to continuation grants.[10]

b. As for the Board's "equitable fair share" of the remaining $22 million, we admonish both parties not to latch on to any rigid percentages, like the 14% figure both sides were using in their papers. Granted, in the fuzzy area of equitable balancing, it is tempting to grab for some

---

9. The parties' dispute over paragraph 9 of the Remedial Order (which provides that ¶ 15.1 applies for five more years) is not urgent. If circumstances change dramatically, this paragraph can be amended. We think five years is proper from this vantage point, given the past conduct of the United States.

10. We recognize that the Secretary probably did not have the Consent Decree in mind when he split the Bilingual Funds into continuation and transition accounts. Our October 15 opinion makes clear that he should have factored the Consent Decree into this decision. Nevertheless, we think it unlikely that his ultimate decision was unreasonable under ¶ 15.1 as construed by the Seventh Circuit. The $22 million is enough for present purposes to guarantee the Board an equitable fair share of the total pool of Bilingual Funds.

measure of certainty. But the equitable fair share of funds will vary from program to program, and our estimate of what happened to be a 10–14% share in other programs is no all-purpose percentage. Without knowing more about this program, we hesitate to make even rough guesses about the Board's share. Nevertheless, we think that the Board is unlikely to recover the full $8 million it has laid claim to. At the same time, the United States is asking for too great an amount to release. A release of $2.5 million, which leaves $5.5 million under restraint would protect both parties pending a resolution of this issue. This leaves under restraint about 7% of the original $77 million, or 25% of the $22 million of new grants, which is likely to cover the ultimate amount awarded to the Board.

c. As for the Secretary's proposal for an administrative review process, this program stands on a different footing from the ones discussed above. In contrast to the situation with the various FY 1984 funds, here we have made no determinations about the cost, relevance or eligibility of all of the Board's Bilingual Transition programs. Further, the delays have not been as long here. The Secretary's review—*if done in good faith*[11]—would not duplicate work the Court has already done. We also welcome the Secretary's experience and expertise. Giving the Secretary such a chance would also be consistent with comity policies expressed by the Court of Appeals in the first appeal. Accordingly, we think that it would be fair and efficient to allow (before the court hearing) the United States to evaluate the Board's application for 1985 Bilingual Transition Funds under a "priority" system which would be consistent with our October 15 opinion. The Secretary may apply this priority without waiving its rights to appeal issues in

that opinion. However, for the reasons stated above at 5, we do not want to inject undue bureaucratic delay into this process. The Secretary has had the Board's application for Bilingual Funds since June, but never made a "priority determination." Even after the October 15 opinion, the Secretary has apparently done nothing. Given this conduct (or, really, lack of conduct), as well as the Secretary's recalcitrant posture throughout this case, we are not inclined to indulge the Secretary with an excessive length of time to mull over the Board's application. Following the date of this order, the Secretary may take 30 days to assess the Board's application under a "priority" analysis, and, among other things, shortly thereafter give his views on the statutory eligibility of the Board's proposed projects and the reasonableness of the Board's projected costs. The Secretary may state his conclusions in writing, which can be made part of the record of the Bilingual proceedings.[12] However, the Secretary's actions in this regard shall not, unless the parties agree otherwise, delay progress of the Court proceedings.

d. We agree with the Board's statement of the relevant issues for the Bilingual proceedings. *See* Board Memorandum titled "Release of the Fiscal 1985 Bilingual" etc., at 2. At this point, we do not think extensive discovery is needed, but any necessary discovery should be expedited. The parties should try to stipulate to as many relevant facts as possible. As for timing, under the Agreed Order dated November 21, 1985, the parties shall submit an agreed discovery schedule within three days of this order.[13]

### C. Conclusion

We reaffirm our status hearing date previously set for Friday, December 20, 1985,

---

**11.** Given other recent signs from the Secretary, we do not think such an administrative review would be futile. Of course, we expect that the Secretary will apply a *meaningful* priority to the Board's application, one consistent with the October 15 opinion. As we note in the text, he may do so while reserving his rights to challenge that opinion on appeal.

**12.** Of course, the Court will make the final decisions in this regard as part of its inherent and ongoing power to enforce the Consent Decree.

**13.** We are not unmindful that an appeal is just around the corner, which is the top priority for the parties. Nevertheless, at the same time, we should try to resolve the bilingual issues as expeditiously as possible.

at 11:00 a.m. At that hearing, the parties shall report on the 1985 Bilingual proceedings as well as the status (and, we hope, a stipulation) of now-deleted paragraph 12 of the Remedial Order, concerning stay issues and interim funding. It is so ordered.